**Mary Jo TAKACS and James Lyons**

v.

**INDIAN LAKE BOROUGH ZONING HEARING BOARD, Indian Lake Borough and St. Clair Resort Development, LLC.**

**Appeal of: Mary Jo Takacs.**

Commonwealth Court of Pennsylvania.

Argued Nov. 9, 2010.

Decided Dec. 16, 2010.

---

Robert P. Ging, Jr., Confluence, and Vincent A. Tucceri, Pittsburgh, for appellant.

Brian P. Litzinger, Johnstown, for appellee Indian Lake Borough Zoning Hearing Board.

Daniel W. Rullo, Somerset, for appellee Indian Lake Borough.

Timothy C. Leventry, Johnstown, for appellee St. Clair Resort Development, LLC.

BEFORE: COHN JUBELIRER, Judge, and BROBSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

Mary Jo Takacs (Takacs) appeals from the December 17, 2009, order of the Court of Common Pleas of Somerset County (trial court), which denied her appeal challenging the validity of Indian Lake Borough's (Borough) Zoning Ordinance No. 144 (Ordinance No. 144). We affirm.

In July 2004, the Borough's mayor recommended that the Borough Council (Council) appoint a zoning committee to study Zoning Ordinance No. 99 (Ordinance No. 99) and provide insight as to how it should be amended. Council then appointed an *ad hoc* zoning committee, which spent hundreds of hours studying Ordinance No. 99 and soliciting information from zoning enforcement officers, planning committee members and zoning hearing board members.

The Borough issued public notices and held public hearings to receive public comment on March 14, 2007, March 28, 2007, June 16, 2007, and August 29, 2007. In addition, Council received public comments at meetings on March 14, 2007, March 28, 2007, April 11, 2007, June 20, 2007, and August 29, 2007. Council also received written comments from the public.

Based on the study and public comments, Council concluded that Ordinance No. 99 contained numerous provisions that were confusing and needed to be amended. Council published a summary of proposed amendments in the *Daily American*, a newspaper of general circulation in the Borough, once a week for two successive weeks. Council also posted the proposed amendments in the Somerset County law library and made them available for public inspection at the *Daily American*, the Borough's offices and the Borough's website. Council also submitted the proposed amendments to the Somerset County Planning Commission (County Commission), which had no comments to offer.

On July 26, 2007, the Borough sent to the Indian Lake Borough Planning Commission (Borough Commission) a letter seeking comments on the proposed amendments. On August 13, 2007, and August 27, 2007, the Borough Commission met to discuss the proposed amendments, now identified as Ordinance No. 144. At the second meeting, by a vote of three to two, the Borough Commission recommended that Council approve Ordinance No. 144.

On August 29, 2007, the Borough enacted Ordinance No. 144 at a public hearing. In doing so, the Borough added uses to some of the zoning districts, including the addition of multi-family structures and commercial boat docking as permitted uses in the Commercial–Recreational (C–R) District. On September 26, 2007, Takacs challenged the validity of Zoning Ordinance No. 144 by filing an appeal with the Zoning Hearing Board (ZHB).

Before the ZHB, Takacs argued, *inter alia*, that Ordinance No. 144 is invalid because: (1) the amendments were not initiated as required by Ordinance No. 99; (2) Council failed to provide notice of a map change; and (3) the changes to the C–R District constituted spot zoning. After hearings on the matter, the ZHB rejected these arguments and denied relief. With respect to the spot zoning issue, the ZHB stated that the issue was waived because Takacs "did not address this subject in the hearings." (ZHB Op. at 9, R.R. at 2275a.)

Takacs appealed to the trial court, which took additional evidence and set forth its own findings of fact. Like the ZHB, the trial court rejected the arguments raised by Takacs. With respect to the spot zoning issue, Takacs argued that adding multi-family structures and commercial boat docks as permitted uses in the C–R District created a lakefront "island" surrounded by residential R–1 District lakefront properties with no relevant distinction between them. Unlike the ZHB, the trial court did not deem the matter waived. Rather, the trial court concluded that Ordinance No. 144 did not create a lakefront "island" because the additional permitted uses applied to the entire C–R District, not just the one lakefront tract in the C–R District. In addition, the trial court concluded that Takacs failed to show that adding the new permitted uses was arbitrary or unreasonable or unrelated to the public health, safety, morals and general welfare.[1] The trial court explained:

> To the contrary, it makes sense that the [commercial boat] docking permitted in the C–R District, which has, for some time, included townhouses, multi-family chalets, A-frames, condominiums, and a

hotel, would be different than that permitted in the R–1 District: only in the latter [i.e., in the R–1 District] do almost all of the landowners' properties abut the lake.[2] Furthermore, this area was previously zoned as CR–H (Commercial Residential Hotel). To the extent that [Takacs] allege[s] that the multi-family structures that are now permitted in this area constitute spot zoning, [Ordinance No. 144] simply restored the multifamily use to the C–R District. In light of the above, the Court holds that "the parcel in question is [not] being treated unjustifiably different from similar surrounding land, thus creating an "island" having no relevant differences from its neighbors."

(Trial Ct. Op. at 13–14) (citation omitted) ( [not] in original). Takacs now appeals to this court.[3]

## I. Section 907 of Zoning Ordinance No. 99

Takacs first argues that Ordinance No. 144 is invalid because the amendments it contains were not initiated by the Borough Planning Commission as required by section 907 of Ordinance No. 99.[4] We disagree.

---

1. When faced with a spot zoning challenge, a reviewing court must presume the zoning ordinance is valid and constitutional. *BPG Real Estate Investors–Straw Party II, L.P. v. Board of Supervisors*, 990 A.2d 140, 150 (Pa.Cmwlth. 2010). The burden of proving otherwise is on the challenging party, who must show that the provisions are arbitrary and unreasonable and have no relation to the public health, safety, morals and general welfare. *Id.*

2. In other words, the owners of R–1 District property abutting the lake would not need commercial boat docking, but the owners of non-lakefront C–R District property who use the lake for boating would need to rent a boat dock. *See Schubach v. Silver*, 461 Pa. 366, 386–87, 336 A.2d 328, 338 (1975) (stating that spot zoning does not occur where there exists

a need in a particular community for a facility).

3. Where the trial court takes additional evidence, our review is limited to whether the trial court abused its discretion or committed an error of law. *Larock v. Board of Supervisors*, 961 A.2d 916, 923 n. 3 (Pa.Cmwlth. 2008), *appeal denied*, 603 Pa. 686, 982 A.2d 1229 (2009).

4. Section 907 of Ordinance No. 99 provides, in pertinent part, as follows.

 [T]he Borough of Indian Lake may by Ordinance after report thereon by the Planning Commission and subject to the procedures outlined herein amend ... the regulations ... now or hereafter established by this Ordinance.... Changes, amendments or

Under section 103 of the Pennsylvania Municipalities Planning Code (MPC),[5] the provisions of the MPC take precedence over and invalidate all local zoning enactments to the extent of their inconsistency. *Boyd v. Zoning Hearing Board*, 83 Pa. Cmwlth. 110, 476 A.2d 499, 501 (1984); *Cohen v. Ford*, 19 Pa.Cmwlth. 417, 339 A.2d 175, 178 (1975). Section 609 of the MPC provides, in pertinent part, as follows:

> (b)(1) Before voting on the enactment of an amendment, the governing body shall hold a public hearing thereon, pursuant to public notice....
>
> . . .
>
> (c) In the case of an **amendment other than that prepared by the planning agency,** the governing body shall submit each such amendment to the planning agency at least 30 days prior to the hearing on such proposed amendment to provide the planning agency an opportunity to submit recommendations. .

53 P.S. § 10609 (emphasis added). Unlike section 907 of Ordinance No. 99, section 609 of the MPC does not require local planning commissions to initiate amendments to zoning ordinances. Thus, to the extent section 907 of Ordinance No. 99 **required** the Borough Planning Commission to initiate the amendments to Ordinance No. 99, section 907 is inconsistent with section 609 of the MPC and, to that extent, is invalid.

## II. Zoning Map Change

 Takacs next argues that Ordinance No. 144 is invalid because the addition of multi-family structures and commercial boat docking as permitted uses in the C–R District constituted a zoning map change, and the Borough failed to provide notice of a zoning map change as required by section 609(b) of the MPC.[6] However, the addition of permitted uses to a zoning district does not constitute a zoning map change.[7] Thus, Ordinance No. 144 is not invalid for failure to give notice of zoning map changes.

## III. Spot Zoning

Finally, Takacs argues that Zoning Ordinance No. 144 is invalid because the

---

special exceptions may be initiated in the following manners:
 A. The Planning Commission may initiate action or changes or amendments by filing a report to the Borough Council of the Borough of Indian Lake.
(R.R. at 919a–20a.)

**5.** Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. § 10103.

**6.** Section 609(b) of the MPC provides, in pertinent part, as follows:

> (b)(1) ... [I]f the proposed amendment involves a zoning map change, notice of said public hearing shall be conspicuously posted by the municipality at points deemed sufficient by the municipality along the tract to notify potentially interested citizens. The affected tract or area shall be posted at least one week prior to the date of the hearing.

> (2)(i) In addition to the requirement that notice be posted under clause (1), where the proposed amendment involves a zoning map change, notice of the public hearing shall be mailed by the municipality at least 30 days prior to the date of the hearing by first class mail to the addressees to which real estate tax bills are sent for all real property located within the area being rezoned, as evidenced by tax records within the possession of the municipality. The notice shall include the location, date and time of the public hearing. A good faith effort and substantial compliance shall satisfy the requirements of this subsection.
> 53 P.S. § 10609(b).

**7.** In *Rickert v. Latimore Township Board of Supervisors*, 869 A.2d 1086 (Pa.Cmwlth.2005), a zoning map needed to be changed when one zoning district was decreased in size and two new zoning districts were added. However, such changes did not occur here.

addition of multi-family structures and commercial boat docks as permitted uses in the C–R District resulted in illegal spot zoning. We disagree.

■■ Spot zoning is a singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character, for the economic benefit or detriment of the owner of that lot. *In re Realen Valley Forge Greenes Associates,* 576 Pa. 115, 133–34, 838 A.2d 718, 729 (2003). The most determinative factor in an analysis of spot zoning is whether the parcel in question is being treated unjustifiably different from similar surrounding land, thus creating an "island" having no relevant differences from its neighbors. *BPG Real Estate Investors–Straw Party II, L.P. v. Board of Supervisors,* 990 A.2d 140, 150 (Pa.Cmwlth.2010).

■■ To establish improper spot zoning, the challenger must prove that the provisions at issue are arbitrary and unreasonable and have no relation to the public health, safety, morals and general welfare. *Id.* If the validity of a zoning ordinance is debatable, it must be permitted to stand. *Id.* Spot zoning cases should be decided on the facts, guided by case law; there is no precise formula for determining whether a rezoning of property constitutes spot zoning. *Id.*

### A. St. Clair's Property

■■ Takacs contends that adding multi-family structures and commercial boat docks as permitted uses in the C–R District is spot zoning because these uses were added to accommodate the development of lakefront C–R District property owned by Terry St. Clair, who was personally involved in the legislative process. We disagree.

■■ The fact that rezoning is done at the request of a landowner does not, in and of itself, invalidate a rezoning. *Schubach v. Silver,* 461 Pa. 366, 384, 336 A.2d 328, 337 (1975). Indeed, in *Plaxton v. Lycoming County Zoning Hearing Board,* 986 A.2d 199, 210 (Pa.Cmwlth.2009), *appeal denied,* —— Pa. ——, 8 A.3d 900 (2010), this court stated that: (1) the state of mind of a legislative body in amending a zoning ordinance is not relevant to determining its validity; (2) the amendment must stand or fall on its own terms; and (3) even the strenuous lobbying by supporters does not itself render the amendment special legislation.

Moreover, the trial court rejected the notion that St. Clair unduly influenced Council's decision to add permitted uses to the C–R District.

> We are unmoved by the innuendo and suggestion ... that St. Clair misused his position in the enactment of the [Ordinance No. 144]. On the contrary, we recognize that in small municipalities there are always few citizens who will take the time to serve their community in elected positions. There was no secret that St. Clair was both President of Borough Council and a land investor who desired to develop his land. Everyone knew it, and when a vote was taken regarding zoning issues, he abstained from affecting the outcome of Borough Council decision making.

(Trial Ct. Op. at 14.)

### B. Other C–R District Property

■■ Takacs also argues that adding multi-family structures and commercial boat docks as permitted uses in the C–R District constituted spot zoning because, although the new uses applied to C–R District land other than St. Clair's lakefront tract, the other C–R District land could not, as a practical matter, be used

for multifamily structures or commercial boat docks. We disagree.

Although it is readily apparent that commercial boat docks cannot be placed on non-lakefront property in the C–R District, allowing commercial boat docks on lakefront C–R District property is not spot zoning unless there is no justification for doing so. The trial court concluded that the commercial boat dock use was justified because such a dock was needed by the owners of non-lakefront C–R District land who used the lake for boating. Takacs does not specifically argue that this is an invalid justification.

The record contains conflicting evidence as to whether it would be possible to place multi-family structures on the other C–R District land. For example, Council member Michael Miscoe testified that he believed that it was not possible due to sewage problems,[8] (R.R. at 746a), but an architect testified that he believed multi-family structures could be placed on the other C–R District land using various sewage systems, (R.R. at 364a, 386a, 388a, 391a–92a, 407a–10a). The trial court found that the C–R District changes did not make St. Clair's lakefront tract an "island" because the changes applied to the entire C–R District. Thus, the trial court clearly believed that multi-family structures could be placed on the other C–R District property.

## C. 1973 Agreement

■■■ Takacs next argues that adding multi-family structures as a permitted use in the C–R District was illegal contract zoning, a form of spot zoning, because the addition was based on a 1973 agreement between the Borough and a former owner of St. Clair's lakefront tract.[9] We disagree.

■■■ Individuals cannot, by contract, abridge the police powers that protect the general welfare and public interest; in other words, where the rights of individuals under a contract are in conflict with the general well-being of the public, the rights of the individual must give way to the general welfare. *Carlino v. Whitpain Investors*, 499 Pa. 498, 504, 453 A.2d 1385, 1388 (1982). A party may not attempt to upset a zoning ordinance as improper contract zoning without alleging specifically where the ordinance is arbitrary or unreasonably discriminatory or without substantial relation to the public health, safe, morals or general welfare. *Gladwyne Colony, Inc. v. Township of Lower Merion*, 409 Pa. 441, 446–47, 187 A.2d 549, 551–52 (1963).

Here, the record shows that the Borough solicitor advised Council to vote on Ordinance No. 144 without regard to the 1973 agreement. (R.R. at 678a, 737a.) However, Takacs points out that section 801 of Ordinance No. 144 states that "uses subject to prior contractual commitments by the Borough are considered conforming for purposes of this Ordinance," (R.R. at 1288a), and Miscoe testified that, "to our knowledge," the 1973 agreement was the only prior contractual commitment with

---

8. Miscoe testified that there are three owners of C–R District property: the person who owns the public golf course; St. Clair, who owns the lodge area; and the owner of the private golf course. (R.R. at 775a–76a.) Miscoe stated that any of those owners might benefit from adding multi-family dwellings as a permitted use if they could get sewage. (R.R. at 776a.)

9. The 1973 agreement, which was between the Borough and Indian Lake Development Co., Inc., and its successors and assigns, allowed the development of multi-family dwellings in the Commercial, Recreational and Hotel District. (R.R. at 1250a.)

the Borough. (R.R. at 727a.) Thus, Takacs contends that, by adopting Ordinance No. 144, Council was adopting the 1973 agreement.

▮▮▮ The reference in section 801 to "prior contractual commitments" does suggest that Council recognized the 1973 agreement in enacting Ordinance No. 144 despite the solicitor's advice. However, under *Gladwyne Colony*, to establish illegal contract zoning based on the 1973 agreement, Takacs was required to show that, to the extent Council relied on the 1973 agreement in adding multi-family structures as a permitted use in the C–R district, the change was contrary to the general welfare of the public. Takacs has not identified evidence in the record establishing that placing multi-family structures in the C–R District is contrary to the general welfare of the public.[10]

### D. Procedural Irregularities

Takacs also argues that procedural irregularities suggest that the changes to the C–R District constituted illegal spot zoning. We disagree.

With respect to this argument, Takacs asserts that: (1) Council formed an *ad hoc* committee instead of using the Borough Planning Commission to initiate amendments to Ordinance No. 99; (2) Council placed St. Clair on the committee; (3) the Borough declined to authorize the solicitor to advise the Borough Planning Commission regarding its duties with respect to Ordinance No. 144; and (4) the Borough removed a member of the Borough Planning Commission who voiced concerns about Ordinance No. 144.

▮▮▮ First, the record shows that Council formed the *ad hoc* committee only after John Walters, who was a member of Council as well as the Borough Planning Commission, indicated that the Borough Planning Commission would not be able to do a "re-work of the zoning ordinance ... any time in this century." (R.R. at 632a–33a.) Moreover, as indicated above, the MPC does not require that local planning commissions initiate zoning ordinance amendments. *See* 53 P.S. § 10609. Thus, the *ad hoc* committee does not constitute an irregularity.

▮▮▮ Second, the record shows that, when Council placed St. Clair on the *ad hoc* committee, St. Clair did not own the lakefront tract in the C–R District. (R.R. at 754a–55a.) After St. Clair purchased the property, he was replaced, and, although St. Clair lobbied for enactment of the amendments, St. Clair abstained on the vote. (R.R. at 652a, 678a–79a, 755a.) Moreover, as indicated above, spot zoning does not occur merely because a landowner requests a zoning change and lobbies for its enactment. *Schubach; Plaxton.*

▮▮▮ Third, the record shows that: (1) the Borough Planning Commission requested that Council provide legal representation, (R.R. at 799a); (2) the solicitor responded by offering to address any legal questions they had, (R.R. at 802a); (3) at its next meeting, the Borough Planning Commission members disagreed as to the need for the solicitor to be present to address any legal questions, (R.R. at 806a); and (4) the Borough Planning Commission then voted to approve Ordinance No. 144, (R.R. at 807a). Given that the Borough Planning Commission decided to take action on Ordinance No. 144 without consult-

---

**10.** We also note that the prohibition against contract zoning does not apply to agreements entered into before a trial court to settle land use disputes. *BPG Real Estate Investors*, 990 A.2d at 147–48. It is not clear from the record whether or not the 1973 agreement was in settlement of a land use dispute before a trial court.

ing the solicitor, Takacs' assertion that Council failed to provide them with legal representation is not material.[11]

■ Fourth, the record shows that Council removed Jeff Griffith from the Borough Planning Commission for malfeasance because he did not attend the meetings. (R.R. at 693a–94a.) Griffith had voiced some concerns about Ordinance No. 144, and, as a result, Council met with him and made some changes based on those concerns. (R.R. at 695a.) There is no indication in the record that Griffith expressed concerns about the changes affecting St. Clair's property or that Council removed Griffith because he voiced concerns about Ordinance No. 144.

Based on the foregoing, we reject the assertion of Takacs that procedural irregularities establish spot zoning in this case.

### E. Impact on Community

■ Takacs argues that Council's failure to evaluate the impact on the community of allowing a commercial boat dock and multi-family structures in the C–R District suggests that the addition of these uses was spot zoning. We disagree that Council failed to evaluate the impact of the changes on the community.

With respect to the commercial boat dock use, the record shows that an expert from Frostburg University conducted a study for the Borough and determined that the commercial boat dock would not pose a safety hazard to navigation on the lake. (R.R. at 697a, 740a–41a, 2277a–78a.) In addition, Council member Miscoe testified that the length of the dock was a subject of public comment and discussions with the police chief and the Fish and Game Commission. (R.R. at 738a–40a.)

Also, Miscoe personally performed measurements and checked lake markers by boat to ensure the safety of the dock. (R.R. at 741a–42a.) Finally, Council defined the dock area so that it would "clear the inlet pipe that the golf course uses to suck water out of the lake." (R.R. at 738a–39a.)

Although Takacs may believe that Council should have done more to investigate the impact of the commercial boat docks on the community, it was reasonable for Council to conclude from these efforts that adding a commercial boat dock to the C–R District would not be harmful to the public health, safety, morals and general welfare.

With respect to multi-family structures, the record shows that multifamily dwellings were permitted on some C–R District property when it was zoned CR–H from the 1970s until the enactment of Ordinance No. 99. (R.R. at 1046a–47a, 1124a, 1145a, 1179a, 1181a, 1207a, 1249a.) With Ordinance No. 99, the Borough changed the CR–H property to C–R property but failed to amend C–R uses to include multi-family dwellings. (R.R. at 668a–69a, 870a, 909a–10a, 947a.) Miscoe testified that he reviewed the public hearings on Ordinance No. 99, the Borough Planning Commission presentations, the Council presentations and the meeting minutes, and that record is completely devoid of any comment that would explain the removal of multi-family dwellings as a use on former CR–H property. (R.R. at 729a–30a, 763a–65a.)

Miscoe further testified that: (1) he believed restoring multi-family dwellings as a permitted use in the C–R District would not harm the community because multi-family structures are a less intensive use

---

11. Moreover, this court has stated that a planning commission is no more than an advisory body whose recommendations have no binding effect on the governing body. *Blue Ridge*

*Realty and Development Corporation v. Lower Paxton Township*, 51 Pa.Cmwlth. 349, 414 A.2d 737, 739 (1980).

of property than commercial uses that Ordinance No. 99 permitted in the C–R District, such as restaurants, lounges, swimming pools, archery ranges, tennis courts, meeting rooms and more,[12] (R.R. at 730a–31a); (2) multi-family dwellings would meet the needs of a number of Borough residents who are aging and unwilling to do property maintenance, (R.R. at 733a); (3) allowing multi-family dwellings in the C–R District would enable the community to expand its tax base in order to raise revenue for a dam remediation project,[13] (R.R. at 671a, 733a–34a); and (4) he did not believe the other C–R District property could be developed with multi-family dwellings, and, thus, the changes would not create density or traffic problems,[14] (R.R. at 660a–70a).

Although Takacs may believe that Council should have done more to investigate the impact of multi-family dwellings on the community, it was reasonable for Council to conclude from these considerations that adding multi-family structures to the C–R District would not be harmful to the public health, safety, morals and general welfare.

Accordingly, we affirm.

### ORDER

AND NOW, this 16th day of December, 2010, the order of the Court of Common Pleas of Somerset County, dated December 17, 2009, is hereby affirmed.

---

12. Brian D. Temple, a land use consultant, confirmed that residential dwellings are probably the least restrictive use of property in a zoning ordinance. (R.R. at 1435a–37a.)

13. We note that, in the Borough's 1992 Ten Year Plan, one of its goals was to increase its tax base in order to afford the rising costs of administration and maintenance. (R.R. at 1021a, 1031a.) Certainly, a dam remediation project would benefit the community as a whole.

14. Although the development of other C–R District property with multi-family dwellings was debatable, where such a matter is debatable, the zoning ordinance must be permitted to stand. *BPG Real Estate Investors*, 990 A.2d at 150.