ATHERTON DEVELOPMENT COMPANY, Appellant

v.

TOWNSHIP OF FERGUSON.

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2011.
Decided Oct. 12, 2011.

David Furer Toal, Millvale, for appellant.

Lewis G. Steinberg, Lock Haven, for appellee.

BEFORE: SIMPSON, Judge, and BUTLER, Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge SIMPSON.

In this zoning appeal, Atherton Development Company (Atherton) asks whether the Board of Supervisors of Ferguson Township (Supervisors) erred in rejecting its validity challenge to the Ferguson Township Zoning Map. Atherton based its challenge on a theory of reverse spot zoning. Specifically, Atherton contends the Townhouse Residential R–3 zoning classification of a portion of its property is invalid where properties on three sides of that property are zoned and developed for commercial use. Atherton also raises several other issues. Upon review, we affirm.

## I. Factual and Procedural Background

In November 2006, Atherton filed a validity challenge to the Ferguson Township Zoning Map, contesting the Townhouse Residential R–3 zoning classification of a portion of its property. Atherton based its challenge on a theory of reverse spot zoning, seeking to have the portion of its property rezoned for commercial use.

The Supervisors held two hearings on the validity challenge, at which Atherton presented the testimony of its representative, a property manager, as well the testimony of a licensed land surveyor. Ferguson Township presented the testimony of its Director of Planning and Zoning, its Township Manager, and a transportation engineer.

After the hearings, the Supervisors issued a decision in which they rejected Atherton's validity challenge. In support, they made the following findings.

Temple Family Partnership is the record owner of a five-and-a-half acre tract (subject property), which is located at the intersection of West Aaron Drive and Martin Street. The subject property is part of a larger tract, which is divided by Ferguson Township's boundary line with Patton Township. The portion of the land situated in Patton Township consists of eight acres and is zoned Commercial C–2. The combined acreage of the tract owned by Temple Family Partnership is 13.5 acres.

Atherton is the equitable owner of the subject property.

Approximately five acres of the subject property is zoned Townhouse Residential R–3 and the remaining portion of the subject property, containing .49 acres, is zoned General Commercial C. The subject property is dual zoned as a result of a lot consolidation in 2006, necessitated by the construction of an extension of Martin Street. Prior to that time, the .49 acre portion of the subject property was part of a larger, contiguous tract zoned General Commercial C.

The subject property is bounded: (1) on the north-northwest primarily by commercially zoned and developed land in Patton Township and partially by residentially zoned land in Patton Township; (2) on the south-southwest by land zoned Multifamily Residential R–4 in Ferguson Township; and, (3) on the south-southeast and north-northeast by commercially zoned land in Ferguson Township. *See* Reproduced Record (R.R.) at 99a, a copy of which is appended.

West Aaron Drive and Martin Street serve as a portion of the subject property's perimeter separating it from the General Commercial C district, which adjoins it in Ferguson Township. The subject property is directly adjoined by the R–4 district in Ferguson Township as well as R–3 and C–2 districts in Patton Township.

The Supervisors found the record lacked evidence as to whether the commercially zoned property adjoining the subject property was rezoned for commercial use or whether it was zoned for commercial use when the applicable ordinances were enacted. The Supervisors determined the record lacked evidence that the portion of the subject property zoned R–3 could not be developed for a permitted use. They

further found there was no credible evidence that Atherton would incur an economic loss in the absence of the requested rezoning because Atherton did not submit any objective economic data. The Supervisors found there was no evidence that the Township's refusal to rezone the subject property represented a "freezing" of undeveloped land in an attempt to prevent development. Supervisors' Op., Finding of Fact (F.F.) No. 19. The Supervisors made no findings pertaining to traffic or traffic studies because they found those considerations were irrelevant to a reverse spot zoning challenge.

The Supervisors also made several legal conclusions regarding Atherton's validity challenge. In particular, the Supervisors stated:

> West Aaron Drive and Martin Street serve as logical boundaries separating the subject tract from commercial districts. Unlike the commercial properties to the north-northwest and north-northeast, the subject [property] does not front on Atherton Street, the primary commercial corridor for the area. The property does, however, front on West Aaron Drive as does the residentially zoned and developed property to its south and southwest. Changing the zoning of the subject property merely would have the effect of moving the boundary line between residential and commercial development further to the southwest.
>
> No evidence was introduced that the subject property could not be economically developed as it is presently zoned.... The R–3 zoning district provides for a form of development which is a logical transitional use between commercial and other residential districts.[1]
> . . .

---

1. Permitted uses in the R–3 District include: two-family detached dwellings; single-family

The subject property is not an island, it is not surrounded by commercially zoned districts; therefore, this in and of itself would be a sufficient basis to deny the validity challenge. In addition, there are no characteristics of the subject property and its environs which distinguish it from either the commercial or residential districts surrounding it and there was no evidence that the property could not, because of any physical or other characteristics be developed in accordance with a permitted R–3 use.

Atherton has not presented evidence, let alone met its heavy burden to show that it is not economically feasible to develop the property as it is currently zoned. A preference to maximize profits rather than to accept an economically feasible alternative is not sufficient. Furthermore, Atherton did not meet its burden to show that the Township's refusal to rezone the subject property is unreasonable, arbitrary or not substantially related to the police power interest

that the ordinance purports to serve. There is no evidence to support a conclusion that the Township has attempted to freeze out development of this property. . . .

Supervisors Op. at 7–8, 9–10; R.R. at 19a–20a, 21a–22a. As such, the Supervisors rejected Atherton's validity challenge. Atherton appealed to the Court of Common Pleas of Centre County (trial court).

Without taking additional evidence, the trial court affirmed.[2] This appeal followed.

## II. Issues

■ On appeal,[3] Atherton raises several issues. It first asserts Ferguson Township's classification of a portion of its property as Townhouse Residential R–3 amounts to a spot zone, and, relatedly, the Supervisors misapplied the standards set forth in spot zoning cases in evaluating Atherton's validity challenge. Atherton also contends the Supervisors erred in:

detached dwellings; single-family attached dwellings; two-family semi-detached dwellings; public recreation areas; churches and other places of worship; public and private schools; nursing and other convalescent homes; personal care boarding homes; forestry uses; zero lot line single-family detached dwellings; single family detached dwellings, multiple buildings on a single lot developed as unified development; and child care centers. Ferguson Township Zoning Ordinance § 27–403.

2. The trial court issued its opinion and order in 2008. Two-and-a-half years later, Atherton, through new counsel, filed a petition for leave to appeal *nunc pro tunc* or "now for then" with the trial court, asking the trial court to allow its untimely appeal of the 2008 order to this Court. In support, Atherton alleged its prior counsel was ill from the time he filed the validity challenge until his death in August 2009. Atherton further averred that, although its prior counsel prepared a timely notice of appeal from the trial court's 2008 order, the appeal was not transmitted to

the trial court despite the best efforts of Atherton's prior counsel's wife, who worked as a secretary for another law firm. Apparently, mailroom personnel working on behalf of the law firm never mailed the appeal.

In light of the circumstances surrounding Atherton's prior counsel's illness and death, the trial court granted Atherton leave to appeal "now for then" to this Court. The parties do not brief the timeliness issue, and Ferguson Township does not challenge the trial court's decision to allow Atherton's appeal "now for then." Nevertheless, it is noteworthy that the trial court enjoyed jurisdiction to permit Atherton's appeal "now for then." *See Weiman by Trahey v. City of Phila.*, 129 Pa.Cmwlth. 25, 564 A.2d 557 (1989).

3. Where no additional evidence is presented after the Supervisors' decision, our review is limited to determining whether the Supervisors committed an abuse of discretion or an error of law. *Caln Nether Co., L.P. v. Bd. of Supervisors of Thornbury Twp.*, 840 A.2d 484 (Pa.Cmwlth.2004).

requiring it to prove "economic loss" through an appraisal or other specific diminution in value in order to establish an unlawful spot zone; depriving it of its right to a fair proceeding; and, failing to analyze the county's comprehensive plan, which designates future use of Atherton's property as commercial.

### III. Discussion/Analysis

#### A. Spot Zoning/Reverse Spot Zoning

 Atherton first argues this is a straightforward spot zoning case. It contends the test for a spot zone is the "singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indistinguishable from it in character for the economic benefit of the owner of that lot or to his economic detriment." *In re Realen Valley Forge Greenes Assocs.*, 576 Pa. 115, 133–34, 838 A.2d 718, 729 (2003) (quoting *Putney v. Abington Twp.*, 176 Pa.Super. 463, 108 A.2d 134, 140 (1954)). Atherton maintains spot zoning can arise in two ways: (1) by an affirmative legislative act of a governing body that affects the parcel at issue (traditional spot zoning); or, (2) by changes to a zoning map around or adjacent to the property at issue (reverse spot zoning). Atherton argues Pennsylvania courts do not apply different standards for spot zoning and reverse spot zoning claims.

Atherton contends the subject property became a "peninsula" of residentially zoned land surrounded by commercially zoned and developed land through map changes enacted by Ferguson Township and Patton Township on adjacent property, thereby creating a reverse spot zone. *See Taylor v. Haverford Twp.*, 299 Pa. 402, 149 A. 639 (1930); *Knight v. Lynn Twp. Zoning Hearing Bd.*, 130 Pa.Cmwlth. 617, 568 A.2d 1372 (1990); *McIlhinney v. Zoning Hearing Bd. of Bensalem Twp.* 72

Pa.Cmwlth. 129, 455 A.2d 1284 (1983); *C.L. Assocs. v. Bd. of Supervisors of Montgomery Twp.*, 51 Pa.Cmwlth. 627, 415 A.2d 134 (1980); *O'Malia v. Council of Twp. of Wilkes–Barre*, 38 Pa.Cmwlth. 121, 392 A.2d 885 (1978). It maintains the Supervisors erred when they found reverse spot zoning required a different standard than spot zoning.

Atherton asserts it fully and conclusively proved the land surrounding the subject property on three sides is indistinguishable in character and circumstance from the subject property. It points out that, excluding the subject property itself, access to the subject property is solely from streets in commercial zones. Moreover, 62% of Atherton's own undivided land (both the Ferguson and Patton Township portions) is zoned for commercial development.

Atherton contends one of its witnesses, who has 15 years of land development experience, testified *without contradiction* that the physical characteristics and circumstances of the subject property are no different than the commercially zoned and developed properties surrounding it on three sides. R.R. at 183a, 195a–96a. It further maintains another one of its witnesses, a licensed land surveyor with 25 years of experience, testified *without contradiction* that the physical characteristics and circumstances of the subject property in terms of topography, infrastructure and existing improvements are the same as those of the surrounding commercially zoned and developed properties. R.R. at 216a–17a. Atherton contends the Township offered no testimony or evidence to contradict the testimony of these witnesses. Therefore, it asserts, the physical similarity of the subject property to the surrounding commercially zoned and developed properties must be accepted as fact. Moreover, Atherton contends, be-

cause it proved the subject property is a peninsula of residentially zoned land surrounded by indistinguishable land zoned and used for commercial purposes, Ferguson Township's refusal to rezone the subject property from residential to commercial should be "deemed arbitrary." *See Realen.*

As a result, Atherton argues the burden shifted to Ferguson Township to prove a "reasonable basis" or "justification" to treat the subject property differently from the surrounding commercially zoned and developed land. *See Bishop Nursing Home, Inc. v. Zoning Hearing Bd. of Middletown Twp.*, 162 Pa.Cmwlth. 118, 638 A.2d 383 (1994); *O'Malia.* It contends the Township did not offer any such reasonable basis or justification. Atherton also argues, the fact that no member of the community objected to the rezoning of the subject property necessitates a finding that the rezoning would not harm the community, and the Supervisors' failure to make such a finding constitutes an abuse of discretion. Additionally, Atherton maintains the Supervisors' decision affords no deference to Atherton or its property rights.

Atherton further asserts the Supervisors employed an incorrect analysis in evaluating its spot zoning challenge. Specifically, Atherton contends that under Pennsylvania law a reverse spot zoning challenge does not invoke a pure substantive due process analysis, or an inquiry as to whether the subject land is rendered valueless as presently zoned. Rather, the Supreme Court inquires into the disparate treatment of a landowner's property as compared to that of surrounding properties and, therefore, requires, at least preliminarily, an equal protection analysis— "[the] singling out of one lot or a small area for different treatment from that accorded to similar surrounding land indis-

tinguishable from it in character...." *Realen,* 576 Pa. at 134, 838 A.2d at 729. The overall inquiry is whether property that is indistinguishable in character from surrounding properties is treated disparately under the zoning map, and, if so, whether a municipality's refusal to cure the illegal spot zone is justified under the comprehensive plan, or is necessary for protection of the public health, safety and welfare.

As to the standards employed in analyzing a substantive validity challenge, in *Realen,* our Supreme Court explained:

[A] zoning ordinance must be presumed constitutionally valid unless a challenging party shows that it is unreasonable, arbitrary, or not substantially related to the police power interest that the ordinance purports to serve[;] nevertheless, [a]mong other reasons, an ordinance will be found to be unreasonable and not substantially related to a police power purpose if it is shown to be unduly restrictive or exclusionary.... Similarly, an ordinance will be deemed to be arbitrary where it is shown that it results in disparate treatment of similar landowners without a reasonable basis for such disparate treatment.... Moreover, in reviewing an ordinance to determine its validity, courts must generally employ a substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power.

Moreover, [t]he substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum*

*non laedas.* 9 Coke 59–So use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

Hence, the function of judicial review, when the validity of a zoning ordinance is challenged, is to engage in a meaningful inquiry into the reasonableness of the restriction on land use in light of the deprivation of landowner's freedom thereby incurred.

*Realen,* 576 Pa. at 131–32, 838 A.2d at 718, 728.

Spot zoning is the "unreasonable or arbitrary classification of a small parcel of land, dissected or set apart from surrounding properties, with no reasonable basis for the differential zoning." *BPG Real Estate Investors–Straw Party II, L.P. v. Bd. of Supervisors of Newton Twp., Delaware Cnty.,* 990 A.2d 140, 150 (Pa. Cmwlth.2010), *appeals denied,* —— Pa. ——, 23 A.3d 543 (2011); *Christman v. Zoning Hearing Bd. of Twp. of Windsor,* 854 A.2d 629, 634–635 (Pa.Cmwlth.2004). "When faced with a spot zoning challenge, a reviewing court must presume the zoning ordinance is valid and constitutional; the burden of proving otherwise is on the challenging party, who must show that the provisions are arbitrary and unreasonable, and have no relation to the public health, safety, morals, and general welfare." *Christman,* 854 A.2d at 635.

"Spot zoning must be clearly established; if the validity of the rezoning ordinance is debatable, it must be permitted to stand." *Id.* The most determinative factor in an analysis of a spot zoning question is whether the parcel in question is being treated unjustifiably different from similar surrounding land, thus creating an "island" having no relevant differences from its neighbors. *Id.*

This Court explained spot zoning as follows:

The key point is that when a municipal governing body puts on blinders and confines its vision to just one isolated place or problem within the community, disregarding a community-wide perspective, that body is not engaged in lawful zoning, which necessarily requires that the picture of the whole community be kept in mind while dividing it into compatibly related zones by ordinance enactments. In other words, legislation as to a spot is the antithesis of zoning, which necessarily functions within a community wide framework.... [Z]oning, to be valid, must be in accordance with a rational and well considered approach to promoting safety, health and morals and a coordinated development of the whole municipality.

*Twp. of Plymouth v. Cnty. of Montgomery,* 109 Pa.Cmwlth. 200, 531 A.2d 49, 57 (1987).

"There is no precise formula for determining whether a classification of property constitutes spot zoning and cases should be decided on the facts guided by case law." *Sharp v. Zoning Hearing Bd. of Twp. of Radnor,* 157 Pa.Cmwlth. 50, 628 A.2d 1223, 1228 (1975).

Reverse spot zoning, the theory advanced by Atherton, occurs where an "island" develops as a result of a municipality's failure to rezone a portion of land to bring it into conformance with similar surrounding parcels that are indistinguishable. *Realen; Briar Meadows Dev., Inc. v. S. Centre Twp. Bd. of Supervisors,* 2 A.3d 1303 (Pa.Cmwlth.2010); *LHT Assocs. v. Twp. of Hampton,* 809 A.2d 1072 (Pa. Cmwlth.2002); *Guentter v. Montgomery Cnty., Borough of Lansdale,* 21 Pa.

Cmwlth. 287, 345 A.2d 306 (1975) (*en banc*).

Our Supreme Court's decision in *Realen* is the seminal case on reverse spot zoning. Although our Supreme Court in *Realen* sustained a reverse spot zoning challenge based on the facts presented there, *Realen* is factually distinguishable from the present case.

In *Realen,* our Supreme Court considered "the validity of the agricultural zoning of a tract located in the heart of one of the most highly developed areas in the region, entirely surrounded by an urban landscape, and immediately adjacent to what is currently the world's largest shopping complex at one discrete location: the Court and the Plaza at King of Prussia." *Realen,* 576 Pa. at 119, 838 A.2d at 720. The 135–acre property at issue in *Realen,* which was zoned agricultural, was used as a golf course and was located at the confluence of the region's primary arterial highways and immediately adjacent to one of the most intensely developed commercial areas in the region. Although surrounding tracts were originally zoned for agricultural use, between 1955 and 1985 the vast majority of the properties in the agricultural district were rezoned to permit intense commercial development, with the exception of the golf course tract. The equitable owner of the golf course tract, who sought to develop it for a large multiuse development, challenged the validity of the agricultural zoning of the tract. The zoning board, court of common pleas and this Court rejected the challenge.

On further appeal, however, the Supreme Court sustained the developer's reverse spot zoning challenge. In so doing, the Supreme Court employed a substantive due process analysis, balancing the landowner's rights against the public interest sought to be protected by an exercise of the police power. The Court explained that in reviewing a spot zoning challenge, the critical inquiry is whether the rezoned land was treated unjustifiably different from similar surrounding land. The Supreme Court stated, "[t]he question is whether the lands at issue are a single, integrated unit and whether any difference in their zoning from that of adjoining properties can be justified with reference to the characteristics of the tract and its environs." *Id.* at 135, 838 A.2d at 730. The Court concluded no difference in the zoning could be justified. Specifically, the Court stated:

We hold that th[e] agricultural zoning [of the property at issue], designed to prevent development of the [property at issue] and to "freeze" its substantially undeveloped state for over four decades in order to serve the public interest as "green space", constitutes unlawful "reverse spot zoning" beyond the municipality's proper powers. . . .

[N]either the zoning board nor the courts below·have offered either reason or authority to support the proposition, essential to the propriety of the decision here reviewed, that the location of [the] highways [that entirely bound the golf course property] makes agricultural zoning appropriate for this tract while the properties on the opposite side of the same roadways are appropriately zoned and developed for intense, commercial use. Any relationship between agricultural zoning and the other tract characteristics identified in the decisions below, including the property's topography and shape, is similarly unexplored in the evidence of record, the findings of the [b]oard, or the arguments of appellees. . . .

On this record, no characteristic of the [g]olf [c]lub's property justifies the degree of its developmental restriction by zoning as compared to the district desig-

nation and use of all of the surrounding lands both within the [t]ownship and in the adjoining municipality. This is spot zoning.

We recognize that the circumstances here presented differ factually from the spot zoning cases we have previously decided in the chronology of the municipal action creating the unjustified "island" of disparate zoning. In previous cases, the island was created by a single municipal act directed toward the property which became the disputed island; either to that property owner's benefit or detriment. Here, in contrast, the [g]olf [c]lub's status as an island of agricultural zoning was the product of a series of rezonings of surrounding properties beginning in the 1950's and ending in about 1985.

[The developer] contends that the origin of a tract's unjustified zoning treatment as compared to adjoining properties is not decisive and we agree. It is the difference in treatment that must be justified, not its origin or chronology. Some courts have used the term "reverse spot zoning" to describe the circumstances where the unjustified difference in treatment arises from the rezoning of lands surrounding the tract at issue and this term appropriately underscores the distinction between cases like that here presented where an island is created by the rezoning of other land from the more common situation where the challenged legislation is that creating the island tract.

*Id.* at 119, 135–36, 838 A.2d at 720, 730–31. Ultimately, the Supreme Court sustained the developer's validity challenge.

Unlike in *Realen,* we agree with the Supervisors here that Atherton did not satisfy its difficult burden. First, unlike the tract at issue in *Realen,* the subject property, which is zoned for high density

residential use as well as other uses, is not completely surrounded by commercially zoned properties. More importantly, there is no indication that the R–3 zoning of the subject property as compared to the commercial zoning of the properties surrounding it on three sides was unjustified. To the contrary, unlike the fact-finder in *Realen,* the Supervisors here reasonably explained why the subject property was treated differently than some of the surrounding areas. Specifically, the Supervisors determined (with emphasis added):

The Atherton property which is the subject of this validity challenge is not an "island". It is not surrounded by commercially zoned properties as it is bounded on the south-southwest by land in the Township zoned and developed as multi-family residential. . . .

In the instant situation, there is no evidence that the Township rezoned any property the result of which was the singling out of the subject tract. An equal protection argument does not arise as there is no evidence that the properties which adjoin the subject one and which are zoned commercial had their zoning changed to accommodate the existing commercial development. . . .

*West Aaron Drive and Martin Street serve as logical boundaries separating the subject tract from commercial districts. Unlike the commercial properties to the north-northwest and north-northeast, the subject [property] does not front on Atherton Street, the primary commercial corridor for the area. The property does, however, front on West Aaron Drive as does the residentially zoned and developed property to its south and southwest. Changing the zoning of the subject property merely would have the effect of moving the boundary line between residential and*

*commercial development further to the southwest....*

Unlike in [*Realen,*] there is no evidence indicating the Township has attempted to "freeze" undeveloped land. *The R–3 zoning district provides for a form of development which is a logical transitional use between commercial and other residential districts.* There is a substantial difference between attempting to place reasonable controls on development and attempting to prevent it, altogether....

*In addition, there are no characteristics of the subject property and its environs which distinguish it from either the commercial or residential districts surrounding it and there was no evidence that the property could not, because of any physical or other characteristics be developed in accordance with a permitted R–3 use.*

Supervisors' Op. at 7–8, 9; R.R. at 19–20, 21.

Our review of both the record and relevant case law supports most of the Supervisors' analysis.

More particularly, in *Guentter,* we rejected a claim of reverse spot zoning based on facts similar to those presented here. There, landowners challenged the residential zoning classification of their 1,000–foot strip of property, seeking to have that land rezoned for professional office use. The strip of land at issue was bounded on one side by a residential district and on the other side by a professional office district located across a street. The landowners claimed the local governing body's refusal to rezone their land for professional office use constituted illegal reverse spot zoning. This Court disagreed, explaining:

In the present case, the 1000–foot strip, for which rezoning is sought, is not surrounded by land which is being treated differently. Rather it is bounded on the one side by a residential district and on the other side across [a street] by a professional office district. The Borough Council after consideration, has decided that the subject strip is more compatible with the adjacent land to the east of it than across the street to the west. Certainly there was honest difference of opinion expressed at the hearing as to how the strip should be zoned and, sound policy might well have supported a decision either way. We cannot, therefore, disturb the legislative decision. It is well established that, if the validity of the legislation is fairly debatable, the legislative judgment must be allowed to control....

The line of demarcation must be fixed somewhere.... To carry [the landowners'] contention to its logical conclusion would lead to the encroachment upon and the complete destruction of the residential character of the other properties in the immediate area. If we were to hold that the zoning of [the landowners'] strip as residential is arbitrary and unconstitutional merely because it is different from the zoning across the street, the same arguments should prevail in favor of landowners immediately adjacent to the subject strip on the east and so on ad infinitum.

*Id.* at 310 (citations and quotations omitted).

More recently, we applied *Guentter* and rejected another similar reverse spot zoning challenge in *LHT Associates.* There, the landowner sought the rezoning of a portion of its split-zoned (residential and commercial) property so that the entire property could be used for commercial purposes. The property was bordered by residential and commercial uses as well as land zoned for conservation. Based on the fact that the property at issue was only adjacent to one commercial property and

the remainder of the surrounding area was zoned for residential use or for conservation, we rejected the landowner's reverse spot zoning claim. Instead, we deferred to the fact-finder's determination that the property at issue was not an "island," which was singled out for differential treatment. In so doing, we noted the landowner's basic argument, that it was subject to reverse spot zoning, was rejected in *Guentter.*

In 2010, this Court again rejected a reverse spot zoning claim in *Briar Meadows.* There, a landowner requested the rezoning of a portion of one of its two properties from agricultural to commercial use. The landowner asserted there were commercial uses in the area of its property and changing the classification of its property to allow for commercial use would create a natural extension of an existing zoning district. The landowner also argued that the split zoning of its property was inconsistent with sound planning and zoning methods. Rejecting these arguments, this Court stated:

> Although [the landowner] argues that failure to grant the curative amendment would result in reverse spot zoning, which occurs when a property subject to restrictive zoning is left behind improperly when other properties are rezoned to more permissive categories[,] [*Realen,*] [n]o such situation occurred here. *No evidence was introduced that other properties were rezoned to more permissive categories. The land which is zoned [a]gricultural abuts other [a]gricultural property and does not sit as an island constituting any type of spot zoning.*

*Id.* at 1309 (emphasis added). This case is more akin to *Briar Meadows, LHT Associates* and *Guentter* than *Realen.* In particular, the subject property here is not an "island." It is not surrounded by commer-cially zoned properties; rather, it is bounded on one side by a multi-family residential use and partially, on another side, by residential use. Like the fact-finders in *Briar Meadows, LHT Associates* and *Guentter,* the Supervisors here determined the subject property was more compatible with the adjoining residential land than the adjoining commercial land, and, as set forth above, it offered record-based reasons for its determination. *See* Supervisors' Op. at 7–8. Further, as in *Briar Meadows,* Atherton did not present evidence that other properties were rezoned to more permissive classifications. Additionally, while Atherton's witnesses expressed their preference to develop the subject property for commercial use, one of its two witnesses conceded the subject property was indistinguishable in character from the adjoining residential use. *See* R.R. at 220a. Thus, no error is apparent in the Supervisors' rejection of Atherton's reverse spot zoning challenge on factual or legal grounds.

Finally, the cases relied on by Atherton do not compel a different result. *Bishop Nursing Home, McIlhinney, C.L. Associates,* and *O'Malia* are factually distinguishable. More importantly, in those cases the governing bodies did not offer justifications for the differences in the zoning of the properties at issue from surrounding properties. Here, however, the Supervisors explained their basis for distinguishing the R–3 zoned subject property from surrounding commercial properties. Specifically, the Supervisors determined that unlike surrounding commercially properties, the subject property does not front on the area's primary commercial corridor. Rather, the subject property fronts on West Aaron Drive, as does the residentially zoned and developed property that adjoins it. Additionally, the Supervisors determined West Aaron Drive and Martin Street serve as logical boundaries separat-

ing the subject property from commercial districts. Also, the Supervisors determined the subject property is indistinguishable from either the commercial *or residential* districts surrounding it, and this determination is supported by the testimony of Atherton's land surveyor. Supervisors Op. at 9; R.R. at 220a.

Nor is this a case like *Knight,* which involved a contract between the governing body and a landowner through which the governing body agreed to adopt a unique classification for the property at issue in exchange for the landowner's agreement to record certain use restrictions for the property. Unlike *Knight,* this case does not involve contract zoning, and there is no clear indication here that the Supervisors intended to adopt a unique classification for the subject property.

Atherton also cites *Taylor,* a 1930 Supreme Court case. There, the Court held a single, triangular lot was improperly classified as residential rather than commercial. Although the local governing body zoned the land residential, the land was primarily adaptable for commercial purposes, was in the immediate vicinity of the business district, was bounded on all sides by public roads and fronted on a major commercial artery.

Here, unlike in *Taylor,* the record does not reveal the subject property is only suitable for commercial purposes. To the contrary, the Supervisors made a finding, supported by the testimony of Atherton's own witnesses, that the subject property could be used in a manner consistent with its R–3 zoning classification. Also, unlike in *Taylor,* the subject property does not front on the area's primary commercial artery.

For these reasons, we reject Atherton's reliance on *Taylor, Bishop Nursing Home, Knight, McIlhinney, C.L. Associates,* and *O'Malia.*

Of further note, as recognized by the trial court:

> While Pennsylvania case law clearly demonstrates that a peninsula, in addition to an island, may constitute spot zoning in the appropriate case, [*see Knight; C.L. Assocs.*], the law is silent as to whether or not a peninsula may form the basis for a claim of reverse spot zoning. [T]he cases cited by Atherton to support its claim that reverse spot zoning may involve a peninsula were cases where the parcel had been subjected to spot zoning—and not reverse spot zoning. [*See Knight* ] (noting that the [t]ownship [s]upervisors rezoned the parcel in question to a [r]ural [c]enter designation and holding that the action constituted spot zoning); [*C.L. Assocs.*] (noting that the [b]oard rezoned the parcel to [r]esidential)[.] . . . In short, case law does not directly address whether or not reverse spot zoning may be claimed when the tract in question forms a peninsula, rather than an island.

Tr. Ct., Slip Op., 4/28/08, at 4; R.R. at 10a. We agree with the trial court's observation. While there is no obvious policy reason why spot zoning jurisprudence should not fully apply to reverse spot zoning cases, we acknowledge that up to this point there has been no successful claim of reverse spot zoning in a "peninsula" fact situation.

## B. Proof of Diminution in Value

■ Atherton next takes issue with the Supervisors' determination that, because the subject property can be developed for residential use under existing zoning regulations, Atherton's validity challenge should be rejected. It asserts the Supervisors erred in determining Atherton had to "prove" economic detriment by an appraisal or specific diminution in value to establish an unlawful spot zone. Atherton

contends the testimony of its representative that it cannot economically develop the subject property under the current zoning map is sufficient. Atherton's argument fails.

First, the Supervisors did not premise their rejection of Atherton's reverse spot zoning challenge on Atherton's failure to present objective economic data regarding its claimed economic detriment resulting from the failure to rezone the subject property. Rather, a careful review of the Supervisors' decision reveals they considered Atherton's failure to present more definitive proof regarding its claimed economic detriment as a factor in their analysis of the reverse spot zoning challenge. As noted above, the Supervisors initially determined Atherton did not prove the subject property was being unjustifiably singled out for different treatment than surrounding properties.

Second, we reject Atherton's argument that the Supervisors erred in considering that it is economically feasible to use the subject property for a permitted purpose as zoned. In *Guentter*, one of the reasons provided by this Court for rejecting the landowners' reverse spot zoning challenge was stated as follows: "this is not a situation . . . where the property was virtually unusable as zoned. The property . . . here could possibly be more lucratively employed if it were rezoned, but this is not the test of constitutionality." *Id.* at 310 (citation omitted). This statement applies with equal force here.

Based on the evidence Atherton presented, the Supervisors found, "[t]here was no credible evidence that the owners of the [subject] [p]roperty would incur economic loss, in the absence of rezoning as no economic data was [sic] submitted." F.F. No. 18. Further, the Supervisors stated:

Given the heavy burden placed upon a party challenging the constitutionality of a zoning ordinance, it is not sufficient for Atherton to either simply express a preference for a requested rezoning or to rely upon uncorroborated conclusions with regard to the economic feasability [sic] of the subject property as currently zoned in order to prove the subject property has been singled out to its economic detriment. The mere fact that the party seeking the zoning change testifies that its goal is to achieve a more lucrative or economically feasible use through the rezoning is not sufficient. [*Guentter*]. Only by presenting specific economic data in the form of appraisals or specific diminution in value by way of demonstrable evidence can an applicant sustain its burden of proving a discriminatory result. [*McIlhinney*]. Atherton did not present testimony that rose to the requisite specificity.

Supervisors' Op. at 8.

We are not prepared to go as far as the Supervisors in declaring that *only* specific economic data can sustain a burden of proving a discriminatory result. Nevertheless, the record supports the factual determinations by the Supervisors. In particular, although Atherton's representative expressed a preference to use the subject property for commercial purposes, *see* R.R. at 190a–92a, she acknowledged Atherton "had an engineer draw up [plans] per the ordinance and he yielded I believe 50 condos or apartment units." *Id.* at 189a. She further testified, "It is just something that we did not want to get involved in. It's not something that looked like it would pencil out and be worth doing. . . . We are commercial developers, we're not residential. When we were shot down in the past in rezoning efforts, we at least investigated the possibility of doing this and given the location, we felt it is a lousy residential site." *Id.* at 190a–91a. However, Atherton did not present any

objective evidence to show that it was infeasible to use the subject property for permitted purposes as zoned. In light of the limited proof presented by Atherton, the Supervisors did not err in determining that Atherton did not prove the subject property could not be developed as currently zoned.

Moreover, as fact-finder, the Supervisors here clearly had authority to reject Atherton's limited evidence. *See Caln Nether Co., L.P. v. Bd. of Supervisors of Thornbury Twp.*, 840 A.2d 484 (Pa. Cmwlth.2004) (supervisors possess exclusive authority over matters of credibility and evidentiary weight; as such, they may reject even uncontradicted testimony if they find it lacking credibility). Thus, it was not error for the Supervisors to determine that Atherton's evidence regarding economic harm was not credible because it lacked specificity. F.F. No. 18.

In short, Atherton was unable to quantify any alleged loss it would suffer absent the requested rezoning. The Supervisors did not err in considering this as a factor in their decision.

### C. Fair Proceeding

█ Atherton next argues that in mounting a validity challenge under the Pennsylvania Municipalities Planning Code (MPC),[4] it was entitled to proceed before a fair and unbiased tribunal. It contends this proceeding had no third party opponents, only the Ferguson Township staff members, who attempted to generate third party opponents. Atherton asserts the Township staff members are employees who serve at the will of the Supervisors, and their ardent opposition reflected the mindset of the Supervisors, the quasi-judicial body deciding this challenge. Atherton contends the Supervisors also decided to encourage municipal opposition by neighboring Patton Township officials after the first hearing. As such, the Supervisors were not independent and unbiased. Therefore, Atherton argues, the Supervisors' violated Atherton's procedural due process rights. Atherton alleges numerous ways in which the Supervisors failed to afford it a fundamentally fair proceeding, including: acting as both advocate and decision-maker; twice denying Atherton's requests for permissive rezoning; hiring special counsel to advocate its own position; and, ignoring the recommendations of the Centre County and Ferguson Township Planning Commissions.

As evidence of the Supervisors' alleged bias, Atherton highlights the testimony of the Ferguson Township Manager as well as a letter he authored to the Patton Township Manager expressing that rezoning of the subject property would adversely affect traffic in both townships. *See* R.R. at 139a–40a, 141a; 354a–56a. Atherton further points to the timing of this correspondence, noting the Township Manager sent his letter after the first hearing, but prior to the second hearing. Atherton asserts the testimony and letter of the Township Manager, who reports directly to the Supervisors and whose continued employment and wages are subject to the unfettered discretion of the Supervisors, reveals the predisposition and bias of the Supervisors in several respects.

Atherton contends the testimony of the Ferguson Township Manager shows the Supervisors' intent to summarily deny Atherton's validity challenge. Atherton further maintains that although the Supervisors ultimately ruled that traffic considerations are not relevant to this validity challenge, the testimony of the Township Manager reveals the Supervisors' predisposition to deny the rezoning based on an

---

**4.** Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202.

issue wholly irrelevant to this validity challenge—traffic. Atherton contends the hidden focus of the Supervisors, freely disclosed by the Township Manager on the irrelevant issue of traffic, explains the absence of any substantive findings on any issue relevant to this validity challenge. Based on the clear and undisputed testimony of the Ferguson Township Manager, Atherton argues, the Supervisors' decision, which is based on irrelevant considerations and reached prior to the second hearing, is unconstitutional. Again, we reject Atherton's argument.

A fair trial before a fair tribunal is a basic and fundamental due process requirement. *Joseph v. N. Whitehall Twp. Bd. of Supervisors*, 16 A.3d 1209 (Pa. Cmwlth.2011). Thus, where a municipal tribunal is acting in an adjudicatory role it must abide by due process standards and avoid the appearance of impropriety. *Kuszyk v. Zoning Hearing Bd. of Amity Twp.*, 834 A.2d 661 (Pa.Cmwlth.2003). A showing of actual bias is unnecessary in order to assert a cognizable due process claim; the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of that right. *Id.*

Here, in support of its assertion that it did not receive a fair hearing, Atherton points to the following excerpt from *Realen* (with emphasis added by Atherton):

> [The developer] contends that it is not possible for a challenger to meet its evidentiary burden where the factfinder possesses such unbridled discretion in its credibility determinations and *the body with the statutory power to appoint members of the fact-finding tribunal-the municipal governing body-actively participates in opposition to the challenge.* Our decision with respect to [the developer's] reverse spot zoning

challenge makes it unnecessary to decide this novel issue....

> We may be presented at some point in the future with an appeal that requires us to decide whether a zoning hearing board's performance of its fact-finding function deprived the applicant of a fundamentally fair proceeding and whether particular necessary findings of the board, although minimally supported by record evidence, *capriciously and without reasonable explanation disregard overwhelming evidence having a contrary import.* We are not required to resolve these issues in the present context and we decline to do so.

*Id.* at 137–38, 838 A.2d at 731–32. As is evident from the above quoted language, the Supreme Court declined to address the issue now raised by Atherton. As such, *Realen* does not support Atherton's argument.

Further, Atherton's claims of bias or commingling of legislative and adjudicatory functions by the Supervisors are unavailing. Despite pointing to the testimony and evidence adduced from the Township Manager, Atherton does not argue that any of the Supervisors, who actually functioned as the quasi-judicial body (and factfinder) here, were biased. *See, e.g., Caln Nether.*

Moreover, Atherton is correct that the Ferguson Township Manager's letter to the Patton Township Manager, which was written after the first hearing but prior to entry of the Supervisors' decision, indicates the "Board has taken the position that rezoning the property from R–3 to Commercial will result in significant negative impacts to both Ferguson Township and Patton Township." R.R. at 139a. However, the letter indicates Ferguson Township opposed the rezoning of the subject property based on concerns over traffic, and the Supervisors' decision specifical-

ly states: "No findings of fact are made pertaining to traffic and traffic studies as such considerations are not relevant to this reverse spot zoning challenge." F.F. No. 21. Thus, there is no indication that the Township Manager's letter regarding negative traffic impacts had any bearing on the Supervisors' decision on the validity challenge.

In addition, when Atherton filed its validity challenge, it had the option of presenting its challenge to the zoning hearing board or to the local governing body—the Supervisors. *See* Section 916.1(a)(1), (2) of the MPC, 53 P.S. § 10916.1(a)(1), (2).[5] Atherton elected to proceed before the Supervisors, and Atherton did not seek the recusal of any member of that body. Moreover, the Supervisors retained independent counsel to defend the validity of the zoning map, as expressly authorized by Section 916.1(c)(4) of the MPC, 53 P.S. § 10916.1(c)(4). As in *Piper Group, Inc. v. Bedminster Township Board of Supervisors*, 992 A.2d 224, 243 (Pa.Cmwlth.), *appeal granted in part*, 608 Pa. 137, 10 A.3d 897 (2010), the proceedings utilized by Ferguson Township were "appropriate and [Atherton] [has] not challenged the constitutionality of the MPC sections providing for such [proceedings,] but rather [it] rel[ies] on various allegations of impropriety." We do not believe the Township acted impermissibly, and we will not undermine the MPC provisions providing for such procedural framework. *Id.*

Further, the Supervisors' decision was subject to review by the trial court. Atherton did not seek to present additional evidence before the trial court regarding its claim that the Supervisors deprived Atherton of its right to a fair proceeding. *Cf. Knipple v. Geistown Borough Zoning Hearing Bd.*, 155 Pa.Cmwlth. 120, 624 A.2d 766 (1993) (concluding zoning board

consciously discriminated against a landowner when it denied his variance request based on findings made by common pleas court after receipt of additional evidence).

Finally, this is not a situation such as that referenced in *Realen*, where the factfinder's necessary findings, although minimally supported by record evidence, capriciously and without reasonable explanation disregard overwhelming evidence having a contrary import. Rather, the Supervisors' findings and determinations here are sufficiently supported by the record. Additionally, to the extent necessary, the Supervisors explained their reasons for rejecting the evidence presented by Atherton.

With regard to Atherton's reference to recommendations by the Centre County and Ferguson Township Planning Commissions, this Court previously stated a planning commission is no more than an advisory body whose recommendations have no binding effect on the governing body. *Takacs v. Indian Lake Borough Zoning Hearing Bd.*, 11 A.3d 587 (Pa. Cmwlth.2010); *Blue Ridge Realty & Dev. Corp. v. L. Paxton Twp.*, 51 Pa.Cmwlth. 349, 414 A.2d 737 (1980). Thus, the Supervisors were not bound by planning commission recommendations.

For these reasons, we reject Atherton's argument that the Supervisors violated Atherton's right to a fundamentally fair proceeding here.

**D. Comprehensive Plan**

■ As a final issue, Atherton asserts, in contravention of the MPC, the Supervisors' decision is inconsistent with the comprehensive plan, and the Supervisors did not provide a justification for this inconsistency.

---

5. Section 916.1 of the MPC was added by the Act of December 21, 1988, P.L. 1329.

Atherton argues once it proved this inconsistency, the burden shifted to the Supervisors to justify such inconsistency. Atherton recognizes that, standing alone, this inconsistency was not determinative; however, it asserts it is highly relevant when the various factors used to determine whether spot zoning occurred are evaluated, in particular, the differential treatment of the subject property from its environs. Again, Atherton's argument fails.

We recently rejected the same argument in *Briar Meadows,* a case which also involved a substantive validity challenge based on a claim of reverse spot zoning. Specifically, this Court explained:

In *CACO Three, Inc. v. Board of Supervisors of Huntington Township,* 845 A.2d 991 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 580 Pa. 707, 860 A.2d 491 (2004), this court addressed the status of a comprehensive plan in reviewing a lower court's disapproval of a preliminary land development plan. This court stated that while a comprehensive plan is a useful tool for guiding growth and development, it is by its nature, an abstract recommendation as to land utilization. Inconsistency with a comprehensive plan is not a proper basis for denying a land development plan. *Similarly, it cannot be a basis for a substantive challenge to a zoning ordinance. Here, [the developer] filed its challenge on the basis that the [o]rdinance, which zones some of the property [a]gricultural, is inconsistent with and fails to comply with the comprehensive plan. As acknowledged by [the developer], however, 53 P.S. § 10303(c) does not authorize such a challenge.*

*Id.* at 1307 (emphasis added); *see also Blue Ridge Realty* (comprehensive plan does not have the legal effect of a zoning ordinance, the former is merely recommendatory while the latter is regulatory).

In a very brief footnote, Atherton asks this Court to recede from the holding above on the ground that our decision in *CACO Three* only held that inconsistency with a comprehensive plan cannot be the *sole* basis for denying a land development plan, and *CACO Three* did not indicate a comprehensive plan is not a factor to be considered. In *CACO Three,* this Court stated:

Although a comprehensive plan is a useful tool for properly guiding growth and development of the community, it is only intermediate and inconclusive steps in the land use planning. Unlike a specific and regulatory zoning ordinance, a comprehensive plan is, by its nature, an abstract recommendation as to desirable approaches to land utilization and development of the community.

Consequently, any inconsistenc[y] with the comprehensive plan, standing alone, cannot justify disapproving the land development plan.

*Id.* at 995 (citations omitted).

Based on the language used in *CACO Three,* which we reiterated virtually verbatim in *Briar Meadows,* we discern no reason to "recede" from our holding in *Briar Meadows.* Further, regardless of Atherton's assertions, Section 303(c) of the MPC, 53 P.S. § 10303(c), makes it clear that a party cannot successfully maintain a validity challenge based on an alleged inconsistency with a comprehensive plan. Additionally, while Atherton asserts a comprehensive plan is a factor to be considered in the context of a validity challenge, as explained more fully above, Atherton's validity challenge fails on the merits. Thus, as Atherton acknowledges, its showing of an inconsistency with the comprehensive plan is, without more, insufficient to prevail on a validity challenge.

## ORDER

**AND NOW,** this 12th day of October, 2011, the order of the Court of Common Pleas of Centre County is **AFFIRMED.**